A. F. BENNETT *et al.* v. GREER GAS COAL COMPANY *et al.*

(No. 9572)

Submitted September 27, 1944. Decided November 14, 1944.

*William T. George* and *William T. George, Jr.*, for appellants.

*Paul B. Ware* and *Robert E. Guy*, for appellees.

Fox, JUDGE:

A. F. Bennett and I. S. Bennett instituted their suit in equity in the Circuit Court of Barbour County against Greer Gas Coal Company and Monongahela West Penn Public Service Company, both corporations, in which they ask for relief as follows: (1) That the deed from the Commissioner of School Lands of Barbour County to

Greer Gas Coal Company, dated November 3, 1932, be set aside, cancelled and annulled as to certain interests in the coal underlying a tract of 120 acres of land situate in said county; (2) that the defendants be enjoined from the use of the mines on said tract of land, and the roads and structures built by them thereon, and from doing further injury to the land; and (3) that damages sustained by the plaintiffs, as the owners of said tract of land, be ascertained and decreed. The defendants filed a joint demurrer, which the Circuit Court sustained on March 16, 1943, as shown by an order entered two days thereafter, but plaintiffs were given ninety days in which to file an amended or supplemental bill. On June 22, 1943, the plaintiffs not desiring to amend, the suit was dismissed on motion of the defendants. From such action of the trial court plaintiffs prosecute this appeal.

It should be stated at the outset that the case must be heard upon a bill which fails to allege many salient facts necessary to a decision of the various points raised on the briefs and oral arguments. Many legal proceedings are referred to in the bill, and many conveyances are relied on which are not set out in the bill, or exhibited therewith. There is great uncertainty as to just what interests plaintiffs have in the 120-acre tract of land in suit, particularly whether they acquired the coal therein, or only the surface; although the general tenor of the bill indicates that the contention is that they acquired not only the surface of the land but all the coal therein which had not been conveyed to Melville Peck. Also, it may be well at this time to set at rest one question raised in the case, and that is whether the suit was dismissed as to both defendants. The demurrer was a joint one filed on behalf of both defendants, and that demurrer was sustained with leave to amend. Later counsel moved to dismiss the suit, and while that order shows appearances made for "the defendant", the order of June 22, 1943, is "that this cause be dismissed", and there is no limitation. We think this amounted to a dismissal of the suit as to both defendants, and this disposes of the contention that the trial court should have

transferred the case to the law side thereof, to ascertain the damages alleged to have been sustained by the plaintiffs on account of the activities of the Monongahela West Penn Public Service Company. There are two reasons why this Court was not called upon to take such action: The first is that the suit was dismissed, and, obviously, no order could thereafter be entered therein; and, second, no request was made by the plaintiffs for such action.

Depending upon the allegations of the bill and the inferences fairly arising therefrom, we find that one Willis Wright was the owner of 120 acres of land in Barbour County. He died testate, and by his will, probated some time prior to June 9, 1902, the date of his death and the probate of his will not being alleged, he devised this land to his son, Samuel S. Wright, subject to the following provision: "And lastly: It is my further wish and will that in the event of the death of my said son, Samuel S. Wright, without children of issues born to him, that the land herein devised to him descend and be held in fee by his brothers and sisters, and their issue surviving him, as my heirs at law." Samuel S. Wright died, without issue surviving him, on September 9, 1939, almost, if not quite, forty years after the death of his father. The provision of the will quoted above was, after the death of Samuel S. Wright, construed in a decree of the Circuit Court of Barbour County, not appealed from, as vesting in Samuel S. Wright such an estate as would pass to his brothers and sisters upon his death without issue surviving him.

Samuel S. Wright appears to have had varying views as to his rights under this will, because on June 9, 1902, he joined with four of his brothers and sisters in conveying his and their right, title and interest in the coal and specified mining rights and privileges in the 120 acres of land; and it appears from the bill that later one of his sisters conveyed her interest in said coal, all conveyances being made to one Melville Peck. The deed to Melville Peck, dated June 9, 1902, is exhibited with the bill. There may have been conveyances of other interests, because the bill avers that on the death of Samuel S. Wright there

survived him ten brothers and sisters, and the allegation is that four of them failed to convey their interests in the coal in the 120 acres, and the suit has proceeded on the theory that there passed to Melville Peck, under the two or more conveyances to him, a two-thirds interest in the coal and mining rights and privileges; and that the remaining interests passed to the brothers and sisters of Samuel S. Wright, who had not at any time conveyed their interests in said coal. But at some time, the bill not disclosing the date, Samuel S. Wright apparently assumed that he owned the 120 acres of land in fee, and, according to the bill, he conveyed the entire 120 acres in fee to one Dallas Shaffer. After the death of Samuel S. Wright, his brothers and sisters, as heirs at law of Willis Wright, deceased, instituted their suit in equity to set aside the deed to Shaffer, and this was done by decree entered by the Circuit Court of Barbour County in 1941. Following this decree, certain of the heirs at law of Willis Wright, deceased, instituted a suit against other of said heirs, in which the 120 acres of land was partitioned, and not being considered susceptible of partition in kind, was sold and purchased by plaintiffs, and conveyed to them on or about the 15th day of May, 1942. That deed is not exhibited with the bill, and we do not know what it purports to convey; nor do we know what the partition suit covered; nor do we know what was covered by the decree in the case instituted to set aside the Shaffer deed. All we know is that, apparently, the plaintiffs have acquired at least the surface of the 120 acres, which would carry with it the right to have that surface protected against unreasonable and improper use thereof in the mining and removal of the coal thereunder.

All of this is by way of approach to the real question presented in this case, namely, whether the deed from J. Blackburn Ware, Commissioner of School Lands, to Greer Gas Coal Company, dated November 3, 1932, passed to the grantee therein all of the coal, and necessary mining rights and privileges for the removal thereof, in the tract of 120 acres. This involves a discussion of the steps leading

up to the execution of that deed, including the assessment of the coal for taxation; its delinquency for nonpayment of taxes; its sale by the Sheriff of Barbour County, and the purchase thereof by the State; and the acquiring of title by the State on account of the failure of the former owners to redeem; and, of course, the proceedings in the case by which the deed aforesaid was authorized.

According to the allegations of the bill, the taxes on the 120 acres of land were paid either by Samuel S. Wright or Dallas Shaffer, and beginning with the year 1911 Melville Peck was assessed with a two-thirds interest in the 120 acres of coal. Apparently this assessment to Peck continued regularly until 1920. How the other one-third interest therein was assessed for said years is not shown, but in 1921 Willis Wright's heirs were assessed with one-third interest in the coal, Samuel S. Wright with the 120 acres of surface, and Melville Peck with two-thirds interest in the coal in said land, which assessment continued for the year 1922. For the years 1923 and 1924, Melville Peck was assessed with 120 acres of coal. For the years 1925, 1926 and 1927 "Melville Peck et al." were assessed with 120 acres of coal, with a notation on the record that it contained sixty acres of Pittsburgh coal. The assessment for the year 1925 is important, because that is the year for which the coal was returned delinquent and sold by the sheriff, and it is therefore important to determine just what that assessment covered. In this connection it is well to note that for a number of years prior to 1925, in the matter of assessment, there was a severance of the coal from the surface. For example, as stated above, in 1921 Samuel S. Wright was assessed with the surface of the 120 acres, Willis Wright's heirs with one-third of the coal, and Melville Peck with two-thirds thereof. Fortunately, the bill itself assists in settling this question, for it avers, "Plaintiffs further aver that, as they are advised, the coal underlying the 120-acre tract of land, which was assessed in the year 1925 to Melville Peck, et al., the other was intended to mean the heirs at law of Willis Wright who had not made any conveyance of their interests in the coal

underlying said tract of land to Melville Peck; that Melville Peck, and these heirs, who had not made any conveyance, were tenants in common in said coal, but said heirs had the fee in remainder in said coal and land, only, after the life estate of Samuel S. Wright had become *extingusihed* by his death." We think, therefore, that the legal effect of the assessment of the 120 acres of coal to Melville Peck et al. was to assess all of the coal in the 120 acres. An assessment does not have to be in the names of all the persons interested in the property assessed. For example, an assessment in the name of one holding a freehold estate in land is an assessment of the estate in reversion or remainder. *State* v. *Mathews,* 68 W. Va. 89, 69 S. E. 644. In this connection, it is strenuously contended that while the tract of 120 acres of coal was assessed for the year 1925, no mining rights and privileges were assessed for that year, and, therefore, none passed to the State, and none could pass to the defendants under their deed from the commissioner of school lands. We think it beyond doubt that the assessment of the coal in the tract of land necessarily carried with it the assessment of such mining rights and privileges as were reasonably necessary for the removal of the coal. If not, the purchaser of coal at a sheriff's sale would get nothing of substantial value. We doubt whether, as a matter of practice, that there has ever been an assessment of mining rights and privileges, separate from the coal, where the coal itself was assessed. We think, therefore, that when the taxes were extended on this assessment, and were unpaid, and the coal was returned delinquent and thereafter sold by the Sheriff of Barbour County, and not redeemed, the title to the coal and the mining rights and privileges connected therewith passed to the State of West Virginia. It may be that as to the coal not conveyed by Willis Wright's heirs, the mining rights and privileges which passed to the State were something less than those contracted for by those who conveyed interests in this coal to Melville Peck. As to those conveyances, the contract, evidenced by the deeds, would control, and might include rights beyond those

necessary to the removal of the coal conveyed; where, as to the unconveyed coal the mining rights which passed to the State would probably be confined to those necessary to remove the coal in the particular tract, and would not extend to the removal of coal from adjacent or neighboring properties, and might be limited in other respects.

Finding that under the sale made by the Sheriff of Barbour County, and failure to redeem therefrom, title to the coal and mining rights in the 120 acres passed to the State of West Virginia, we come to the proceeding in which this property was sold for the benefit of the school fund. That suit was instituted early in 1929, and its style was *State of West Virginia* v. *Napoleon State Bank, et al.,* in which the 120-acre tract of coal was proceeded against as Tract No. 73. We do not have before us any of the papers in that cause. We do not know who were made parties thereto. We only know, according to the allegations of the bill, that Nancy Wright Thompson, Edith Wright Costellow, John Wright, and Z. Elden Wright, heirs at law of Willis Wright, deceased, and who are the persons who never conveyed to anyone their interests in the coal in said 120 acres, were not made parties; and it is alleged that by reason of the failure to make these individuals parties to that suit, the deed later executed under authority of decrees entered therein was void, to the extent that it conveyed the interests in the coal to which said parties then had an expectant or contingent interest. This contention is made under the provisions of the statute, in effect as of the date of said suit, in which it was provided that, "* * * the former owner of any such tract of land at the time of the forfeiture thereof, or the person in whose name the same is forfeited, shall, if known, be made a defendant in such suit, and all persons claiming title to or interest in any such land shall, also, as far as known, be made defendants therein". Code, 1923, Section 6, Chapter 105. However, the bill, while averring that the above-mentioned persons were not named as parties, contains this allegation, "plaintiffs aver that the Commissioner of School Lands did not make even the unknown heirs of

Willis Wright, deceased, parties in said Chancery cause; that the only provision in said suit was that all unknown heirs of any of the foregoing parties who may now be deceased and all unknown claimants of any of the tracts or interest in tracts of the real estate mentioned on the Auditor's list of 1925 delinquent school lands." It is apparent, therefore, that there was what might be called a dragnet effort to draw into the suit all unknown claimants.

This question reaches the very heart of the matter. Many decisions of this Court, including *Blake* v. *O'Neal,* 63 W. Va. 483, 61 S. E. 410; *Preston* v. *Bennett,* 67 W. Va. 392, 68 S. E. 45; *Neal* v. *Wilson,* 79 W. Va. 482, 92 S. E. 136; *Ellis* v. *Hager,* 87 W. Va. 313, 104 S. E. 607; *Asbury* v. *Adkins,* 107 W. Va. 626; 149 S. E. 831; *State* v. *Felty,* 109 W. Va. 384, 155 S. E. 122; *State* v. *Musgrove,* 109 W. Va. 247, 153 S. E. 515; *State* v. *Raymond,* 115 W. Va. 596, 177 S. E. 687; and *Bank of Quinwood* v. *Becker,* 119 W. Va. 534, 194 S. E. 849, hold that failure to make parties known persons interested either as former owners or otherwise, renders any proceeding affecting their interests void. But we think the rule is that in ascertaining who are known persons, a plaintiff instituting suit is not called upon to go beyond an investigation of the records in the county in which the property affected is situated. If the records of the county show that certain persons are interested in the land as owners, or have liens thereon, or the State through its representative in the person of the commissioner of school lands has actual knowledge of such interest, then they are known, and must be made parties to any proceeding affecting their interests. Here we do not think it can be said that the Willis Wright heirs were known by the State to have any interest in the 120 acres of coal proceeded against in the suit instituted in its name to sell the same. While the will of Willis Wright did disclose that, in the event of Samuel S. Wright's death without issue surviving him, the 120-acre tract of land devised to him would pass to his brothers and sisters, or to their issue, as heirs of Willis Wright, yet, at the date of the institution of that suit to sell the 120 acres of coal,

Samuel S. Wright was living, and the possibility of his dying with issue surviving him still remained. Had he done so, the deed executed by him to Melville Peck in 1902, being a deed which conveyed all of his right, title and interest in the coal in the entire 120 acres would have vested in Peck title to all of the coal therein, for, at that time he had a vested title thereto, subject only to being divested on his death without leaving issue surviving him. Thus, in 1929, it could not be determined who would be the heirs of Willis Wright on the death of Samuel S. Wright. It was then possible that the brothers and sisters of Samuel S. Wright living in 1929 might not survive him. An interest in the 120 acres of coal could not, in any event, vest in the Willis Wright heirs until the death of Samuel S. Wright, and in 1929 it was impossible to determine who those heirs were or would be. The will of Willis Wright does not mention the names of any of his heirs, and necessarily could not, because he did not know who they would be on the death of Samuel S. Wright. On the whole, we conclude that the records of Barbour County did not, at the time of the institution of the State's suit in 1929, disclose that the four persons who failed to convey their expectant and contingent interests in the 120 acres of coal were persons known to be interested therein; and this being true, we cannot say that the deed executed by J. Blackburn Ware, Commissioner of School Lands, to Greer Gas Coal Company was void as to the claimed interests of said parties in said coal.

Another obstacle to a decree in favor of the plaintiffs is this: As the law was prior to the enactment of Section 52, Article 4, Chapter 117, Acts, 1941, (Code, 1943, 11A-4-52), plaintiffs' suit might have been sustained as a petition to redeem their interests in the 120 acres of coal, under the authority of *Neal* v. *Wilson, supra,* and *Asbury* v. *Adkins, supra.* But Section 52 referred to above provides: "All suits now pending in any circuit court for the sale of land for the benefit of the school fund shall be and are hereby discontinued and dismissed. Any circuit court in which such a suit is pending shall make all neces-

sary orders for such discontinuance and dismissal." Obviously, if there was no suit pending, no petition to redeem, or paper having that effect could be filed therein, and if plaintiffs' bill may be maintained on any ground it must be on some ground other than its being headed as a petition to redeem. There appears to be no remedy under the guise of redemption, but it is a fundamental principle of equity that no wrong is without a remedy, and we are inclined to the view that, but for the existing title vested in the Greer Gas Coal Company under its deed from the school commissioner, aforesaid, the allegations contained in the bill with respect to the ownership and interests in this coal, and the alleged violation of plaintiffs' rights in respect to the surface owned by them, the bill could be maintained in an independent suit.

But Section 52 goes further and provides: "All sales and conveyances made in any former circuit court suits for the sale of lands for the benefit of the school fund are hereby confirmed. Whatever right, title or interest the State had in any land so sold, shall be deemed to have vested in the purchaser or grantee thereof. Notwithstanding any irregularity, error or mistake in such suit or in the tax enforcement proceedings prior thereto, such title shall not hereafter be subject to attack. This paragraph is enacted in furtherance of the purpose and policy set forth in section one, article three of this chapter." When we go to Section 1 of Article 3, we find that the general purpose of the Act was to settle titles arising out of the sale of delinquent lands, and to secure to the purchaser, under any proceeding arising out of such delinquency, the full benefit of his purchase. This curative statute is not new. In slightly different form, it has been on the statute books for many years, and has been interpreted by this Court. In *McGraw* v. *Rohrbough,* 74 W. Va. 285, 82 S. E. 217, it was held that failure to make a former owner a party to a suit to sell land for the benefit of the school fund was cured by the provisions of Section 19, Chapter 105 of the Code, 1913. But this opinion, we think, was departed from in *Neal* v. *Wilson, supra,* wherein the failure of the

state to make an owner of property, whose title thereto was shown on the records of the county in which it was situate, a party, rendered a deed executed under the authority of such proceeding void as to such owner, and other cases cited herein follow this principle. In *White* v. *Wickham & Son*, 112 W. Va. 576, 165 S. E. 805, this Court held that, "The curative provisions of Code 1931, 37-3-34, relating to irregularities in school commissioner's proceedings, do not affect prior vested rights of an owner in whose name the property was at the time of its sale to the state.", and cases are cited in support of this proposition, particularly the case of *Neal* v. *Wilson, supra*. In discussing the case the Court said, "The right of redemption vested in the plaintiff upon the acquisition of title by the State through sale of the property to it for non-payment of taxes. The legislature having bestowed such a right upon claimant, could not by a subsequent act take it away. To do so would be in violation of the due process clause of our Constitution. We are of opinion that the legislature did not intend to affect such vested rights by the curative statute, Code 1931, 37-3-34, especially in view of 63-1-2, wherein it is specifically provided that all enactments contained in the Code as revised shall not affect any 'established right, accrued, or accruing, before the day this Code takes effect.'" This case would throw doubt upon the force and effect to be given to the 1941 statute, provided that, at the time of the sale of the 120 acres of coal in question in 1927, the plaintiffs or the four children of Willis Wright who did not convey their interests in said coal had a vested right therein. It is clear that the plaintiffs did not then have such vested right, or any character of right, because they acquired no interest in the coal, or the land overlying the same, until 1942; and for reasons stated above, we do not think it can be said that any of the four persons named had, in 1927, a vested interest in the coal aforesaid, or in the 120-acre tract of land. At most they had an expectation of an interest therein, which might thereafter become vested in them should Samuel S. Wright die without issue surviving him. For this reason we think Section

52, Article 4, Chapter 117, Acts, 1941, should be construed to bar plaintiffs from any relief, even assuming, for this purpose only, that the plaintiffs, in their purchase of the 120 acres of land, acquired the coal thereunder which had not been conveyed to Melville Peck. As stated earlier in this opinion the record does not clearly show that they acquired any interest in the coal.

The suggestion is made by counsel for defendant that inasmuch as the bill alleges that Greer Gas Coal Company entered upon the land in question, and proceeded with mining operations soon after their purchase in 1932, it is fair to assume that they have paid taxes thereon for five years, and that this being true, even if the deed from Ware, Commissioner of School Lands, was void, it was good as color of title, and, under the provisions of Section 3 of Article XIII of the Constitution of West Virginia, there was a transfer to the Coal Company of title to the coal; and it is also indicated in the brief of the appellee that the trial court, in passing upon the demurrer, was of the opinion that failure of the claimants to the unconveyed portion of the coal in the 120 acres, to have their property assessed for five years operated as a forfeiture thereof to the State, and that title would pass to the Coal Company under the transfer provisions of the Constitution. The fault with these contentions is this: We are considering this case upon a demurrer to the bill. The bill does not clearly show on its face the necessary possession; and there is nothing in the bill that indicates anything as to whether the Greer Gas Coal Company paid taxes for any year since they have had possession of the land, or that the present claimants to an interest in this coal have not had the same assessed. Whatever may be the facts with respect to the assessment or non-assessment, or the payment or non-payment of taxes, there is nothing in this record upon which this Court could make any finding on that question.

It is not intended by our decision to express any opinion as to the rights of the plaintiffs, in respect to the alleged improper use of the mining rights and privileges on the surface of the 120 acres owned by them. In our view of

the case, the mining rights and privileges which the coal company may exercise depend, first, on the contract rights thereto vested in Melville Peck; and, second, the reasonable right to remove the coal from the said lands which the Coal Company acquired under its purchase of the coal in the suit instituted by the State to sell said coal for the benefit of the school fund. As noted above, these rights may not be the same as to the entire tract. The allegations of the bill, in our opinion, are too vague and indefinite, with respect to the exercise of these mining rights and privileges, to warrant this Court, in determining what character of relief, if any, should be granted in respect to the exercise of the mining rights attached to the coal. Therefore, we express no opinion on this point, and our affirmance of the decree appealed from will be without prejudice to the rights of the plaintiffs to prosecute such suits or actions as they may be advised, in respect to the privileges being exercised by both the defendants herein, under authority of the mining rights and privileges claimed to be owned by the defendant, Greer Gas Coal Company. Subject to this reservation, the ruling of the Circuit Court of Barbour County is affirmed.

*Affirmed.*